## MUMMA v. READING CO.
### No. 8506.

Circuit Court of Appeals, Third Circuit.

Argued March 9, 1944.

Decided Dec. 12, 1944.

Henry R. Heebner, of Philadelphia, Pa., (Wm. Clarke Mason, of Philadelphia, Pa., on the brief), for appellant.

Robert M. Bernstein, of Philadelphia, Pa. (Milford J. Meyer, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, JONES, and Mc-LAUGHLIN, Circuit Judges.

JONES, Circuit Judge.

The defendant railroad company appeals from a judgment for the plaintiff in a suit instituted under the Federal Employers' Liability Act[1] for damages for injuries received by the plaintiff as a result of the defendant's alleged negligence. It is conceded that at the time of the injury to the plaintiff both he and his employer (the defendant company) were engaged in interstate commerce. No question is raised as to the plaintiff's right to sue on the cause of action supplied by the Federal Employers' Liability Act. The issues submitted to the jury were whether the defendant was guilty of negligence which was the proximate cause of the plaintiff's injury and whether the plaintiff was contributorily negligent. Special findings, favorable to the plaintiff on both issues, were made by the jury which also returned a general verdict for the plaintiff for a sum of money upon which the judgment appealed from was duly entered by the trial court.

The appellant contends that (1) the plaintiff failed to meet his burden of proving that negligence on the part of the defendant was the proximate cause of his injury, (2) the plaintiff alone caused his own injury by alighting from the train on which he was employed without looking for impending danger in violation of the employer's safety rules and is, therefore, not entitled to recover and (3) even though the defendant was negligent, the plaintiff was contributorily negligent as a matter of law

[1] Act of April 22, 1908, c. 149, 35 Stat. 65, as amended, 45 U.S.C.A. § 51 et seq.

and, therefore, the special finding of the jury freeing the plaintiff of contributory negligence is erroneous. Consideration of the appellant's contentions necessarily requires that the evidence be recited at some length.

At the time of his injury, John T. Mumma, the plaintiff, had been an employee of the defendant company for thirty years. For the last twenty-three years of that time he had been a train conductor. On the day of the accident, Mumma in accordance with orders had taken a work train to a point called Otto's Crossing, some few miles west of Harrisburg, Pa., to pick up coal which had been spilled on the right of way there by a car derailment earlier in the week. The work train had been assembled and manned at Rutherford, Pa., a few miles east of Harrisburg. The train was made up of a locomotive and approximately eleven cars consisting of gondolas, a flat car on which was mounted a crane or "ditcher" for use in picking up the coal from the tracks and a passenger car or "rider" for the use of the trainmen and a work crew which was aboard the train. The work crew under a foreman was to perform the work of picking up the coal. The train crew consisted of an engineman, fireman, two flagmen and the plaintiff who was the conductor in charge of the train's operation.

The work train proceeded west on the westbound (north) track of the defendant's double-track railroad until it reached Boiling Springs, Pa., a few miles west of Harrisburg and about a mile east of the point where the work of picking up the coal was to be performed. The train was stopped at the Boiling Springs station. From the station Mumma called the train dispatcher at Reading for permission to use the eastbound (south) track while doing the work at Otto's Crossing. He received the necessary authority and was informed that there would be some heavy traffic on the westbound track that forenoon but that there was nothing then scheduled to move eastward on the eastbound track. Mumma thereupon took the train west from Boiling Springs on the westbound track to a point beyond Otto's Crossing in order to place a flagman (one Mutzabaugh) in a position to protect the work train against eastbound traffic. The train was then backed to Boiling Springs where it was switched over onto the eastbound track

and proceeded westward to Otto's Crossing. After arriving at Otto's Crossing, Mentzer, the rear flagman, asked Mumma how they were going to pick up the coal. Mumma told him that he intended to pick it up from both sides of the tracks and that he (Mentzer) was to flag all westbound trains all day until given further orders. These instructions contemplated that Mentzer would put two warning torpedoes on the westbound track and wave a red flag to "flag them [westbound trains] down." Following these instructions Mentzer proceeded east toward Boiling Springs to take up his position.

The loading of the coal was commenced. The operation, while in progress, necessarily blocked both tracks. As already disclosed, the work train itself was on the eastbound track and when coal was being picked up on the north side of the tracks the overhanging crane fouled the free-way of the westbound track. Likewise, when coal was being picked up on the south side of the track the cab of the crane blocked the course over the westbound track.

When the near ends of the two cars on either side of the crane had been filled with coal it became necessary to rearrange the train so as to place empty car space next to the crane. For that purpose the train was backed to Boiling Springs, that is, proceeded eastward on the eastbound track. At Boiling Springs, Mumma again called the dispatcher at Reading to get permission to use the westbound track for the purpose of accomplishing the shift. The permission was granted and Mumma was told by the dispatcher that there was a local at Brandtsville, eleven miles east of Boiling Springs, and that there was "an extra on the P. H. & P. but he [the dispatcher] did not know where it was". Mumma knew that the "extra" referred to, as well as the Brandtsville local, were on the westbound track. He was also told of an eastbound train that was due to come through some time later.

At the time the shift-over was being made at Boiling Springs, Mentzer (the flagman) was posted east of that place. When the cars had been rearranged and the train was ready for the return trip to Otto's Crossing on the eastbound track Mentzer was called in and the train moved west. Mentzer dropped off some distance west of Boiling Springs to take up his duty

of flagging westbound traffic as appears from his testimony. Mumma rode in the cab of the engine which was a "camelback" type with the cab at the middle of the locomotive. As the train approached Otto's Crossing, Mumma climbed down from the cab of the engine on the right-hand side. As the crossing was reached, the train was going about two to three miles per hour. Mumma was facing in the direction of the train's motion, i. e., westward. Without looking back along the westbound track he stepped off the engine between the two tracks, took two or three steps toward the westbound track and was struck by the locomotive of a westbound freight train which happened to be the "extra" above-mentioned, a freight train composed of an engine and approximately seventy-nine cars.

The plaintiff had dismounted from the work train for the purpose of going to a telephone on the north side of the tracks to contact the dispatcher concerning the eastbound train that had been previously reported. He testified that he did not look to see if there was a train coming, as he had no reason to expect one. He relied upon Mentzer to obey his orders to flag all westbound trains, such orders never having been changed since they were first given that day.

Depositions were read at trial as a part of the evidence for the plaintiff. One of the depositions was by Mentzer, the flagman, who testified that he had not flagged the train which struck Mumma and further that, as the work train approached Otto's Crossing just prior to the accident, he had alighted from the moving train at a point some distance west of Boiling Springs in order to take up his duty of flagging westbound trains. In answer to a specific question, Mentzer stated that he had received no instructions at that time. He had placed warning torpedo signals on the westbound track and was standing on the eastbound track when the locomotive of the westbound freight train exploded the torpedoes. The work train had not yet reached Otto's Crossing when he let the westbound freight train pass him. Very shortly after the last car of the freight train had passed him the train made an emergency stop and he thereafter learned of the accident.

The engineman of the freight train testified by deposition that his engine explod-ed the torpedoes and that he had answered with two blasts from the whistle. From his side of the cab he could not see any flagman and was not flagged. He was proceeding at a speed of from fifteen to twenty miles an hour when he overtook the work train. He did not see Mumma. His fireman told him of the accident. Thereupon he stopped his train within sixteen or eighteen car lengths.

The fireman of the freight train also testified by deposition that he, too, heard the torpedoes explode. He knew that they meant to watch out for something ahead. He saw a man (undoubtedly Mentzer) standing on the eastbound track with a flag folded up under his arm. The train was not flagged. As they were passing the work train he saw a man standing on the front of the work train locomotive and when the freight train locomotive was about six feet away the man stepped down and was struck.

In cross examination Mumma admitted that he knew the following general safety rules of the defendant company:

"Rule 4. Employees must be on the lookout for their own safety and must not depend on supervisors or other persons to warn them of approaching danger. At places where clear view cannot be obtained, extra precaution must be taken. In case of doubt, always pursue the same course."

"Rule 204. Employees in getting on or off moving cars, locomotives or motors must have a secure hold on grab irons and hand holds, to be sure that there is sufficient side clearance and safe footing for alighting and know that no trains are approaching on adjacent tracks. They must not get on and off when the speed is such that it cannot be done with safety."

The appellant's contention that the plaintiff failed to meet his burden of proving negligence on the part of the defendant, which was the proximate cause of his injury, is based upon an allegedly irreconcilable conflict between the testimony of the plaintiff and that of his witness Mentzer. Whether a direct contradiction between the plaintiff and one of his witnesses, as to an essential fact, would conclusively bind the plaintiff with the testimony of his witness to the complete exclusion of his own testimony, we need not now consider. There is no such conflict in this record. That Mumma instructed

Mentzer, when they first arrived at Otto's Crossing to begin the day's work, that Mentzer should flag, i. e., stop, all westbound trains all day until given further orders was neither denied by Mentzer nor by any other witness for the plaintiff. Mentzer's testimony that, upon alighting from the work train just west of Boiling Springs after the interim car shift, he had received no "instructions from Mumma" reasonably meant no more than that he had not then received further instructions. It did not mean that his instructions for the day had been either countermanded or superseded or that, thenceforth, he was without any instructions. Mentzer, himself, was apparently under no misapprehension as to his duty in the circumstances. He had already placed two torpedoes on the westbound track which the oncoming "extra" exploded as both the engineman and fireman of that train testified. Just why Mentzer did not also "flag down" the "extra", we need not now explore. That he did not do so plainly appears from the evidence. The evidence clearly warrants a finding that the defendant ran a train past Otto's Crossing, while the work of picking up the coal was in the course of performance, without first apprising the plaintiff of its intention so to do. That constituted negligence which was the proximate cause of the plaintiff's injury.

■■ The appellant's second point that the plaintiff's failure to observe the defendant's formal safety rules was the sole proximate cause of his injury is untenable. As was said in Louisville & N. R. Co. v. Hood, 149 Ga. 829, 102 S.E. 521, 523 (a case under the Federal Employers' Liability Act),—"If the defendant was negligent, and negligent in such a way as to bring about or contribute to the injury, the fact that the plaintiff failed to exercise diligence, when under the circumstances by the exercise of diligence he might have avoided the injury, in no wise makes his negligence the sole cause of the injury." See also Union Pacific Railroad Company v. Hadley, 246 U.S. 330, 333, 38 S.Ct. 318, 62 L.Ed. 751. It is only where the alleged negligent act or omission on the part of the employee was the sole proximate cause of his injury, without any contributing causation on the part of the employer, that the employee will be denied in toto a right of recovery under the Federal Employers' Liability Act. See Grand Trunk Western Railway Company v. Lindsay, 233 U.S. 42, 47, 49, 34 S.Ct. 581, 58 L.Ed. 838. The court below very properly refused to enter judgment for the defendant n. o. v. on either of the two grounds above discussed.

■ We come then to consider whether the plaintiff's failure to observe the defendant company's general safety rules, by alighting from the engine cab without looking backwards, made him guilty of contributory negligence as a matter of law. In Gildner v. Baltimore & O. R. Co., 2 Cir., 90 F.2d 635, 637, it was held that the mere violation of a railroad's general rules for the safe conduct of its employees is not negligence per se. In that case the assailed conduct occurred in connection with the usual and ordinary operation of the railroad.

Here, the task of picking up the spilled coal had to be performed outside the usual and ordinary course of the railroad's operations and, from the time the work train began to "buck traffic" by proceeding westward from Boiling Springs on the eastbound track until normal transportational conditions were again resumed, the work called for absolute protection to the work train, her trainmen and the work crew against danger from any passing traffic. To assure that protection, flagmen had been properly placed and fully instructed. In these circumstances, there is no basis for arbitrarily saying, as a matter of law, that the plaintiff was negligent because he assumed that the flagmen would do their duty and, as a consequence, he did not observe a formal rule of safety applicable to normal traffic conditions. Suppose that, instead of striking Mumma, the engine of the "extra" had run into the overhanging boom or the cab of the crane, while it was swinging around for the purpose of picking up coal from either side of the tracks, would it be suggested that the collision was due, as a matter of law, to negligence of the craneman in not observing the oncoming train which should not have been there? Whether the injury to the plaintiff was due in any part to his failure to use due care under the circumstances was a question of fact for the jury, to which, that question was fairly and impartially left by the trial court. The appellant's theory is wholly incompatible with the doctrine of comparative negli-

gence which obtains under the Federal Employers' Liability Act. See Grand Trunk Western Railway Company v. Lindsay, loc. cit. supra.

Finally, the appellant argues that the jury's special finding that the plaintiff was free of contributory negligence, as well as its general verdict, is against the overwhelming weight of the evidence. This contention does not require lengthy discussion. It is based for the most part on a number of alleged deficiencies or inconsistencies in the plaintiff's testimony, as ascribed by the appellant. At best, these complaints go to matters which were for the jury to ponder and resolve in the light of all the evidence.

The judgment of the District Court is affirmed.